IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO.   21-cr-00421-CMA

UNITED STATES OF AMERICA,

      Plaintiff,

v.

JOE THOMPSON,

      Defendant.

___

## SENTENCING STATEMENT
___

Pursuant to the Court's Order during the change of plea hearing,[1] and in accordance with D.COLO.LCrR 32.1(a), Joe Thompson, by and through his undersigned counsel, hereby respectfully informs the Court that he will be requesting a sentence of 30 months of incarceration in this case, to be followed by 3 years of supervised release. In support of his position, Mr. Thompson states as follows:

### PROCEDURAL HISTORY

On December 15, 2021, Mr. Thompson was indicted on an alleged violation of 18 U.S.C. § 922(g)(1) (possession of a firearm and ammunition by a prohibited person), with an offense date of November 10, 2021.[2] He was arrested several days later, and has been detained in connection with this case ever since.[3] On April 19, 2022, Mr.

---

[1] *See* ECF No. 21, Minute Entry.

[2] *See* ECF No. 1, Indictment.

[3] *See* ECF No. 11, Order of Detention; ECF No. 12, Copy of Executed Arrest Warrant.

Thompson appeared before the Court and entered a guilty plea to the sole count charged in the indictment, without a plea agreement with the government.[4]

Despite the lack of a plea agreement, the parties do not dispute the relevant facts underlying this offense.  Mr. Thompson possessed a loaded .40 caliber pistol that the police discovered inside of a backpack that was inside of a car that he was driving.[5]  He has prior felony convictions and was aware that those convictions made it unlawful for him to possess a gun or ammunition.  *Id.*

## ANTICIPATED SENTENCING GUIDELINE ISSUES

Although there is little dispute about what transpired in this case, counsel anticipates that there will be a significant debate about the applicable guideline calculation.

Because the primary guideline in this case is USSG §2K2.1, whether or not Mr. Thompson has prior convictions that would count as "crimes of violence", as defined in USSG § 4B1.2 and the commentary thereto, for the purpose of determining his base offense level, is likely to be a significant contested issue at sentencing.  Counsel believes that Mr. Thompson's prior conviction in Denver County case 2013CR147 for attempted second degree assault—drugging (an F5 felony), and his prior conviction in Larimer County in case 2016CR1037 for second degree assault—cause injury with deadly weapon (an F4 felony), will be the subject of considerable debate.[6]  If neither of

---

[4] *See* ECF No. 21, Minute Entry*;* ECF No. 22, Defendant's Plea of Guilty and Statement of Facts Relevant to Sentencing (Without Plea Agreement).

[5] *Id.* at pgs. 2-3.

[6] Specifically, counsel expects there to be disagreement between the parties as to the scope and application of *United States v. Ontiveros*, 875 F.3d 533 (10th Cir. 2017).

2

these prior convictions qualifies as a crime of violence, as Mr. Thompson asserts, his base offense level would be 14. If only one counts, his base offense level would be 20. If both are deemed to be crimes of violence, his base offense level would be 24. Additionally, Mr. Thompson has a case currently pending in Denver County where the allegation is that he participated in a robbery/menacing offense with a firearm in October of 2021. Counsel's understanding is that the government intends to seek a four-level enhancement on the basis of that case[7]—something that Mr. Thompson cannot comment upon because that case remains pending, other than to emphasize that he continues to enjoy the presumption of innocence.

After adjusting for acceptance of responsibility, and given what the parties believe is his criminal history category of V, the parties' respective positions as to Mr. Thompson's estimated guideline range could thus be as much as 13 levels apart—ranging from his calculation of 27-33 months,[8] all the way up to 100-120 months.[9] Given that gulf, counsel anticipates that there will be significant subsequent briefing no matter how the Presentence Report ("PSR") ultimately calculates the applicable guideline range in this case, and respectfully requests that she be permitted to make further argument as to the governing legal issues once the PSR has been prepared.

---

[7] See ECF No. 22 at p.4.

[8] BOL of 14 pursuant to USSG §2K2.1(a)(6); minus 2 for acceptance of responsibility pursuant to USSG §3E1.1; leaving an adjusted offense level of 12.

[9] BOL of 24 pursuant to USSG §2K2.1(a)(2); plus 4 pursuant to USSG 2K2.1(b)(6)(B); minus 3 for acceptance of responsibility pursuant to USSG §3E1.1; leaving an adjusted offense level of 25.

## APPLICATION OF §3553(a) SENTENCING FACTORS

Joe Thompson is a complex and multi-faceted young man. On the one hand, his prior record is troubling and the instant possessory offense both potentially dangerous and deeply disappointing to those who know and care for him. One the other hand, the man who will come before the Court for sentencing in a few months is quite insightful and self-aware, and appears to be on the verge of burying the foolishness of his youth in favor of starting a more mature chapter of his life with the support of his fiancé and family.[10]

This internal tension was apparent almost immediately. Even as counsel prepared for the original detention hearing, she learned that, though he was on parole for a serious offense at the time of this one, Mr. Thompson's parole officer had many positive things to say about him and the strides he had taken while on supervision. Before being charged federally, Mr. Thompson had been released on bond in his state case and was in perfect compliance with his release conditions— in the words of his supervising agent, he was "contrite" and "remorseful" and had been using the time to get himself "back on track". Specifically, Mr. Thompson was working, participating in a

---

[10] Mr. Thompson is at an age where social science tells us that the human brain is just reaching full maturation. *See, e.g., Miller v. Alabama*, 567 U.S. 460, 477 (2012) (noting that the "hallmark features" of youth are "immaturity, impetuosity, and failure to appreciate risks and consequences"). Countless studies, including one co-sponsored by the International Association of Chiefs of Police and the Department of Justice's Office of Juvenile Justice and Delinquency Prevention, have found that, "The human brain is not fully developed until the mid to late 20's including functioning that controls impulses, calms emotions, provides an understanding of the consequences of behavior, and allows for rational decision-making." *See* "The Effects of Adolescent Development on Policing", IACP/OJJDP, January 2015, available at https://ojjdp.ojp.gov/library/publications/effects-adolescent-development-policing. Unsurprisingly then, as a young person matures into adulthood, his risk of engaging in anti-social activities or recidivating drops markedly. *Id.*

4

reentry group, and, crucially, not drinking. He had a courtroom full of people at his detention hearing—all willing to vouch for him and all praying he would come home. But even after that hope has long been put to rest, all of those people returned, filling two rows at his change of plea hearing. This is a young man who is truly beloved and supported by many.

But Mr. Thompson has also traveled a difficult road in his life—one that has been marked by abandonment, instability, suicidality, the long reach of intergenerational trauma, substance abuse, educational disruption, and persistent mental health difficulties. As of the filing of the instant pleading, two documents have yet to be finalized that counsel believes will shed significant light on Mr. Thompson's history and characteristics and well as on the type of educational, vocational, medical care, correctional treatment and general rehabilitative services that might be most appropriate for him: the Presentence Report itself, and a social history narrative that is being compiled by an investigator with the Office of the Federal Public Defender based upon a review of Mr. Thompson's medical, educational, and legal records along with detailed interviews with Mr. Thompson, his family, and other collateral sources. Counsel respectfully requests leave to supplement this filing and/or to expound about how Mr. Thompson's personal history should impact the sentence in this case in a motion for a variance (depending on Probation's final guideline calculation) once those documents have been finalized so that the Court has the benefit of a more fulsome picture of Mr. Thompson's background and needs.

Thus, while counsel anticipates filing more detailed pleadings in the weeks before sentencing, she briefly notes the following with respect to several of the other

§3553(a) factors that the Court must consider at Mr. Thompson's sentencing.  First, the sentence that he is requesting is wholly consistent with what individuals in this District, who share his criminal history category, have received in firearm cases with USSG §2K2.1 as the primary guideline over the last seven years.  *See* Exhibit A, a series of tables generated by United States Sentencing Commission's Interactive Data Analyzer.[11] The Commission's data reflects that over 75% of the ninety individuals falling within criminal history category V that were sentenced for gun offenses in Colorado since fiscal year 2015, received a sentence of less than 60 months.  *Id.*  The average overall sentence was 48 months which, while higher than Mr. Thompson's request, is not so high that it would create significant unwarranted disparities between him and other similarly situated individuals.

Nor does Mr. Thompson need a lengthy prison term to deter him from engaging in future criminal conduct or to motivate him to succeed.[12]  He is now 28 years old and

---

[11] The tool, which can be used to access and sort data for all of the cases reported to the USSC since Fiscal Year 2015, is available at https://ida.ussc.gov/analytics/saw.dll?Dashboard.

[12] The literature has consistently found that using increased imprisonment to accomplish deterrence has proven to be ineffective, convincing even the United States Department of Justice. *See, e.g., Five Things about Deterrence*, National Institute of Justice (NIJ) from the United States Department of Justice; available at https://nij.ojp.gov/topics/articles/five-things-about-deterrence#addenda.  Increasing imprisonment simply does not accomplish the "chastening effect" that is sought, and the prison experience may, conversely, actually exacerbate recidivism. *See id.*  This broad consensus has only been further confirmed by a recent meta-analysis of the available studies.  *See* Damon M. Petrich, Travis C. Pratt, Cheryl Lero Jonson, and Francis T. Cullen, *Custodial Sanctions and Reoffending: A Meta-Analytic Review*, forthcoming, University of Chicago Press Journals, abstract available at https://www.journals.uchicago.edu/doi/10.1086/715100.  Specifically, the abstract notes that,
> "Previous narrative reviews and meta-analyses concluded that the overall effect of imprisonment is null. Based on a much larger meta-analysis of 116 studies,

has spent nearly all of his adult life in custody. He used his prior periods of incarceration as productively as possible: earning his GED, taking community college classes, holding down jobs both in and out of the facilities, cultivating his relationship with his children and supportive family members, and earning the respect of his bosses and his treatment providers. But incarceration has not, and likely will not, help Mr. Thompson sustainably and successfully manage his trauma history and substance abuse issues. What can actually help him do that are the therapeutic and supportive services available through the Probation Office, paired with close supervision to ensure that he stays on the right track. A thirty-month prison sentence followed by intensive supervision, with specially crafted conditions designed to help him work through the obstacles that his history and background have created and to successfully reintegrate into the community, would give Mr. Thompson an opportunity to achieve lasting stability, thereby decreasing any future risk to public safety, increasing the likelihood of his contributing in positive ways to his family and community, and saving thousands of taxpayer dollars relative to the costs of additional imprisonment.

## **CONCLUSION**

Wherefore, Mr. Thompson respectfully submits that a sentence of 30 months of incarceration, followed by three years of supervised release, would be sufficient but no

---

the current analysis shows that custodial sanctions have no effect on reoffending or slightly increase it when compared with the effects of noncustodial sanctions such as probation. This finding is robust regardless of variations in methodological rigor, types of sanctions examined, and sociodemographic characteristics of samples. All sophisticated assessments of the research have independently reached the same conclusion. The null effect of custodial compared with noncustodial sanctions is considered a "criminological fact." Incarceration cannot be justified on the grounds it affords public safety by decreasing recidivism." *Id.*

greater than necessary to accomplish the goals of sentencing set forth in 18 U.S.C. §3553(a).  Mr. Thompson respectfully requests leave to submit additional argument in support of the appropriate sentence in this case after he has had the opportunity to review the Presentence Report and any sentencing motions or briefs filed by the government.

    Respectfully submitted,

    VIRGINIA L. GRADY
    Federal Public Defender


    s/ Stephanie Snyder
    STEPHANIE SNYDER
    Assistant Federal Public Defender
    633 17th Street, Suite 1000
    Denver, CO  80202
    Telephone: (303) 294-7002
    FAX: (303) 294-1192
    Stephanie_Snyder@fd.org
    Attorney for Defendant

**CERTIFICATE OF SERVICE**

      I hereby certify that on May 3, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following e-mail addresses:

    Celeste Rangel, Assistant United States Attorney
    Email: Celeste.Rangel @usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non-CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

    Joe Thompson (via U.S. Mail)

                                      s/ Stephanie Snyder
                                      STEPHANIE SNYDER
                                      Assistant Federal Public Defender
                                      633 17th Street, Suite 1000
                                      Denver, CO  80202
                                      Telephone: (303) 294-7002
                                      FAX: (303) 294-1192
                                      Stephanie_Snyder@fd.org
                                      Attorney for Defendant